Nintendo, 2016-1499. Mr. Baker. Good morning, Your Honors. May it please the Court. This case presents the important and fundamental question of whether inventions directed to data compression technology can be patentable or not. Data compression is an important area of technological innovation and inherently involves mathematical algorithms. Improvements to data compression come about through new and innovative and better algorithms for compressing the data. The District Court opinion here could be taken to mean that data compression is simply not patentable. In particular, the District Court said, the innovation claimed by the 303 patent is merely a more efficient manner of encoding composite facial image data. That is not enough. And that decision puts all data compression patents at risk, everything from MP3 audio coding technology to video coding. And even beyond data compression, it puts other technologies such as encryption technology and error correction coding technology that depend on improvements to mathematical algorithms at risk of being totally unpatentable. And the industry and the Bar need guidance from this Court on this critical question of whether data compression technology is patent eligible. Counsel, I appreciate your argument that the patents is aimed at the data compression technology. But your claims to me seem to be directed just to encoding and decoding. Well, Your Honor, encoding and data compression in this context mean the same thing. And in particular, in the specification, it talks about… I mean, encoding, if I get a piece of paper and I write one on it, I've coded that. I haven't compressed it. I haven't done anything. I've just put one on it. But if one means something, if there's a code book, for example, that says one means… But your claims reach out and capture what it means. Yes, it does, Your Honor. Because it appears to me that your claims are stuck here. And what this means is out there, your claims haven't…you haven't claimed that. So that's…I say this so that you can understand where my concern is with your position. Okay. Well, let me point to one thing or the same thing that the spec says a couple of times and also what the claims say about what the encoded quantity represents. And so the claims refer to generating a composite facial image code. And in the specification, it says that the image code is a compressed digital representation of the image. And it says that in three separate places, in column 2, line 56, column 3, line 39, and column 3, line 48. It talks about the image code is a compressed digital representation of the image. That's how it's defined. And the claims themselves also reflect that idea because it talks about the fact that the composite image is associated with a composite facial image code. And it talks about what's in that composite facial image code. Well, look at the first line on the summary of invention on column 2, line 16. The invention provides a novel method and an apparatus for encoding messages. So when I read that, I mean, what I saw or thought of immediately were getting pictures and writing grandpa on it, getting another one and writing, you know, great time in Switzerland. Right. That's not what's meant by it. This is not about tagging images. You know, this is a picture of my vacation. That's what this says. It's about encoding images. Right. But in this context, Your Honor, what it's talking about is being able to represent that image in a more compressed manner such that exact image can be recreated or reproduced at another location. Right. And that's what it says. If you look right up above the summary of the invention in that paragraph starting at line 9, it says, thus there exists a need in the industry to refine the process of encoding images such as to reduce the memory requirements for storage and the bandwidth required for the transmission of the image. So that makes clear that encoding is talking about compressing the image to represent the image in a manner that allows it to be stored using less space, to be transmitted more quickly and to be reproduced. I see that, and I see that that's what it says. But what you're talking about is a need that exists in the industry. Your next sentence doesn't reach that need. It doesn't tell me how the claims are directed or limited in a way that meet that compression need. Right. Well, I think if you read on down through the summary of the invention, it talks about how the invention generates this image code, which is a compressed representation. So instead of doing what was done in the prior art, where you would code each pixel individually, like JPEG codes each pixel individually, instead of doing that, what the patent says is you should code the features. Say the eyes are this type of eye. They're located at this position. They're this color. The nose is this type of nose, and it's at this position and this size. And by combining all that information, the entire image can be represented more efficiently by this image code, which is based on the features in the image rather than based on simply compressing the pixels that are in the image. Is that in the last limitation of your claim that's talking about reproducing the composite image on a second display based on the composite facial image code? Yes, yes, yes. That is accurate, Your Honor, that once you have this composite facial image code, it can be used to reproduce the exact image that you started with on another device or at another location and get back the exact same image and to do that in a way that avoids degradation of the quality of the image and uses less space to store it and less space to transmit it. Well, that's the claim limitation that brings out the decoding. Yes, yes, yes. In Claim 1, that's where it implicitly talks about decoding because it's reproducing the image using or based on the composite facial image code. Some of the other claims talk more explicitly about decoding, but all of the claims use this composite facial image code to allow for the reproduction of the image more efficiently. You rely on ENFISH quite a bit in your briefing. And the ENFISH is talking about whether a claim is directed to a technological improvement. I think that's how you characterize it, an improvement to the computer technology itself. I think in that case it was memory and using the memory with a self-referential table. Is that the same as your case or is it different in the sense that I think of your case perhaps as having an invention directed to the improvement of the data, making the data smaller, as opposed to improving the data and not necessarily improving how the memory works or changing how the memory works. It's just storing less data to represent different information. Well, I think both cases are similar in that they both involve application-level data structures that store information more efficiently. In ENFISH, it didn't involve a change to the hardware. It didn't involve a change to the firmware or the operating system. It was directed at a database application that had a better way or a better data structure or data model for storing data in the exact same memory of a generic computer. It was a generic computer. It was just an application-level data structure. The functioning that was changing was how the memory itself was storing the information. It was changing how the application was storing data in the memory. It wasn't changing the hardware or any kind of low-level aspect of the memory pipeline. It was just changing the data structures that were used. Instead of using a relational database, it used a soft-referential data structure. And the same thing applies here. It's talking about an application-level software that is going to store the information that allows this image to be represented and recreated in a different way, using a new type of data structure, using this composite facial image code. And by storing the information in that way, it allows it to take up less space, just like in ENFISH, and allows it to be retrieved and transmitted more quickly. And in ENFISH, it talked about the speed as well. So in both cases, the information or the data is being stored in a different way, in a way that's different than the prior art ways of storing it. When I read Claim 1, it gets me to thinking, okay, so I encode images, and I get a box of these images, or, you know, with Judge Stull, she has the images. Then I pick up a phone and I say, 2335300, and I hang up. And then she reaches in her box, pulls out 23305, the numbers I said, and she has the image. That's the way it's been done in the past in the industry, correct? I mean, that's the detective kit. Oh, yes. If you're talking about the identikit, I guess there's two main responses. What I don't see in the claim, and I just looked at Claim 1 again because I don't want to miss it, is I don't see the compression that you're talking about, and I don't see the storage. I don't see how this solves the need in the industry to create more storage space for the images. I mean, can you point to Claim 1 and show me where that's at? Yes, yes. So at least, first of all, procedurally, we don't think identikit should be considered for the reasons we discussed in our brief. We don't think it's properly part of the record on appeal. But even if you do consider it, the invention here has at least two fundamental differences from how identikit operated. One is the fact that this invention uses code factors, and second, that the invention combines the different element codes together using code factors to multiply the facial image code together in a particular algorithm. And even counsel for Nintendo doesn't argue that the identikit combined the element codes together in that matter. So there is definitely a specific technological difference and improvement over the way identikit operated. With respect to your question about where is the actual compression in the claim, it comes about by the fact that it associates each facial feature with a facial feature element code. So in other words, whereas the prior art would just code the whole image, it didn't know where the eyes, where the nose, where's the mouth. This invention says instead of doing it that way, each different part of the face gets an element code that describes that particular part of the face. And by putting all that together, it requires less storage space than to code each pixel individually as was done in the prior art. And so that's where the compression comes about because it's using a facial feature element code to represent each facial feature. That's where the compression comes from. Mr. Baker, you want to save some rebuttal time? You're halfway through it. Okay. Yes, your honor. Thank you. I will save my remaining time for rebuttal. Good morning. May it please the court. I'm Mark Paris. Together with Will Milahani, we represent Nintendo. District court here got it right. The 303 failed to satisfy both aspects of the Alice test. District court in its own words said the following, the 303 is directed to the abstract idea of encoding and decoding composite facial images using a mathematical formula. That's what the 303 is. When the district court moved on to step two, he said the following, the innovation claimed by the 303 patent is merely a more efficient manner of encoding composite facial image data by using a generic computer. That's what the 303 is. But before we get into the actual Alice test, let's step back a moment and actually think about what the 303 is, what that patent is. I want to put it in context, if I could. When you look at the 303, a prime example it gives of what it is trying to accomplish is simply trying to transfer information more efficiently from point A to point B. When you look at page 26 of the appendix, you see exhibit A and that's what it shows, box A to box B. That's what it's trying to do. In a real life example, what it's talking about is the following. I'm a police officer at police station A. I want to transfer information and be able to describe who the suspect is or missing person is to a police officer at station B. Like you said, Judge Reyna to Judge Stoll. How do we accomplish that? What the 303 says is we're going to do that on a feature by feature approach. What we're going to do is assign numbers. We're going to assign numbers to things. We're going to assign a number to the mouth, we're going to assign a number to the nose, we're going to assign a number to the eyebrows. The problem with that, of course, from the standpoint of patentability is that's conventional. That's what was already happening out there. It's the exact same thing that the identikit was doing since the 1950s. The situation where what you would do with mylar transparencies is you would have images of the nose, the mouth, the eyes. It would be assigned a value like nose number one, mouth number two, eyes number three. You would simply transfer that information by picking up the phone or seeing it face-to-face to the person at police station B. Here's what the code is. You have your libraries independently and you can put these same mylars together. In addition to the identikit, importantly here when you look at the patent itself, this is an interesting concession that plaintiff's counsel wants to avoid. Look at Kakeyama. Look at the prior art that's not only described in the patent but actually incorporated into the patent. What are we talking about there? We're talking about encoding on a feature-by-feature basis. Sounds like you're talking about 102 and 103 rather than abstractness. First of all, with respect to abstractness, I'm not talking about that. What I'm talking about is what was conventional. As we know, what this needs to be is unconventional. Attacking more directly the Alice test under what this patent is directed to. What is it directed to? Again, the patent answers that question. One of the points that I had in my argument was the precise one you made, which is what does the summary of invention say about this? The summary of invention says it provides a novel method and apparatus for encoding images. That's one reason we know that's what it's directed at. Another reason is the title. What's the title of the patent? Method and Apparatus for Encoding and Decoding Image Data. That's what this is about. Is it your position that any method and apparatus for encoding and decoding is not eligible under 101? Not necessarily. What you'd have to do there, if it's encoding and decoding, again, this is an age-old concept. That's the Morse Code. That's the periodic table. That's when you go to a fast food restaurant and you say, instead of burger, fries, and a Coke, I want combination number one. That's encoding. That's simply assigning a number to a thing. That's age-old. That is abstract. Now you move to step two. Is there an inventive concept? You're talking about a particular case here still. In this particular case, yes. You're not addressing my question, which is whether it's your position that all encoding and decoding is ineligible. I think if it's just encoding and decoding, simply assigning numbers to a thing, such as here, that that is an abstract idea. That doesn't mean it's patent ineligible. Again, if there is something in addition to that, a transformative step of some sort, that actually changes the nature and substance of the patent, and it actually is providing some type of technological solution to a technological problem that actually significantly enhances or improves a computer's functionality or capability, then yes, that's patentable. And that's EnFish. That's Amdocs. That's Bascom. That's DDR. That's McGrow. Those five cases taken together tell you that's the test. Counselor, what's your response to your colleague's argument to us that within Claim 1, we find the compression limitation? Well, you don't. There is no compression that's happening here. This patent is not about compression. This patent does nothing with ones and zeros or anything like that. All it does is do a feature-by-feature encoding method. That's what it concerns. It's basically using numbers to represent pictures. It's encoding. There's not compression that's going on here. This isn't a JPEG situation or otherwise. What happened when you look at the specification is they identified pixel-by-pixel, but their solution is not pixel-by-pixel. They're not doing anything with a pixel-by-pixel approach. What they're doing is a feature-by-feature approach. Again, if you step back and understand what they're trying to accomplish here, how do we more efficiently transfer information from point A to point B? Sounds a lot like Shortridge. Same type of situation. How they did it here was to add an algorithm. What they did was take the conventional encoding and decoding process that was in place in Identikit, same process, and they just migrated that to a computer. How is the computer used? It's used in the generic, everyday fashion to do the types of things that computers do. It's not changing the computer in any way. It's not increasing or affecting the functionality or the capabilities of the computer. You're simply taking, frankly, the Identikit and you're migrating it to a computer. You're assigning numbers to things, to facial features, and then you're transferring that information. Interestingly enough, keep in mind that, as the court pointed out, this doesn't even require a computer. Keep in mind that you can transfer that information verbally over the phone. This is not a technological solution to a technological problem. It has technological advantages in the sense that it is true that you'd be transmitting less information and you would have to store less information, although you would have to have some sort of database that contained all the various images that correspond to the various feature sets, numbers. I'll agree with you that if you want to define technologically that broadly, perhaps arguably, but let's think about it. I just said there's an advantage. There's an advantage. I don't think it's a technological advantage. There's a potential advantage. Was there an advantage to the Identikit? Absolutely so. This is the Identikit migrated to a computer. If this did something more, if there was something additional that actually changed the actual capabilities or functionalities of the computer, then we would be talking about EnFish more directly. How do you distinguish EnFish? EnFish is exactly that. Remember what the court said in EnFish was the following, that it's an unconventional solution, an unconventional technological solution to a technological problem that greatly enhanced and improved the computer's functionality. It actually was dealing with distributed architecture there. What you're talking about is actually changing the capabilities of the computer itself. This doesn't do anything to the memory. This doesn't do anything to storage. This doesn't do anything to transmission. The computer is still operating in the same fashion. You're not introducing something in addition to what the computer already has. What you're doing here simply is taking, again, an age-old concept of assigning a number to a picture and you're moving it onto a computer. This court has again and again said that's not enough. Think about what happened when this patent went through its history. This isn't the first time it faced 101. It was determined ineligible under Section 101 by the PTO originally. What did they do? They slapped on a computer. That was okay at that point under NREALA patent. Then what happened? We flash ahead to the re-exam process. What happens at that point? The PTO looked at it and concluded that everything described in that patent is conventional. It's already out there. In order to allow it, what did they have to do? They had to add an algorithm. As we know from Fluke and any number of other cases, that adding a mathematical algorithm doesn't render an eligible patent patentable. Think about that algorithm itself. Look at what it says. It's a very broad-based, non-descriptive algorithm. It simply requires a simple and single multiplication operation. It doesn't even tell you how that's going to work. That's not found in the claims. You have to go to the specifications to understand how that algorithm, an abstract idea in itself, works. What you have here at base, Your Honor, is the following. You have an abstract idea of encoding and decoding. They've added a generic computer, and they've added another abstract idea of an algorithm. That doesn't overcome the Alice test. There's nothing that's inventive. There's certainly not a transformative step here. This is in the heartland of Alice. It's very similar, as I said, to Shortridge. You've got an algorithm that allows you to transfer information more efficiently, arguably. That's it. Court has no further questions. Let me see if I can wrap up briefly for you. I think it's important, when you think about this, and you think about how both the patent is written and how my colleague wants to address it, what he's really doing is dressing up words using different jargon, code factor, the image code. When you break that down, what you find is that's the same types of things that were already out there in the prior art. What you're talking about is just a fancy name for a number that represents a facial feature. That was already being done out there. That's Kakeyama. That is the identikit. There is literally no difference between the identikit and this, other than adding a generic computer and an algorithm. Importantly, in Kakeyama, you don't even have any difference, other than the fact that it doesn't have an algorithm. Kakeyama has a computer. You're utilizing a computer. It's done within a computer environment. Keep in mind, again, as we step back, we look at what the test is here. In my view, when you put those cases, that handful of cases together, in which you derive the idea that it really does have to be a technological solution to a technological problem that greatly advances the computer's capabilities. Again, we don't have a technological problem to begin with, and we certainly don't have a technological solution that is unconventional. That's the critical word in the beginning of that test. It has to be unconventional. There is nothing unconventional. Does the technological solution have to be outside of the abstract idea or the technological? For step two, I believe Alice says, when you look at the claims as an ordered combination or individually, there's something more than the abstract idea there. There's this technological advantage. Does that have to be outside of the abstract idea itself? What if the abstract idea itself is the thing that provides the technological advantage? I think that, just working it through, if you've got step one, is it an abstract idea? If it is an abstract idea, I think it's disqualified as a result of that. What you see, I'm struggling a little bit with, Your Honor, in the fact I'm running through all the cases and all the scenarios and thinking through, has there ever been a situation where the abstract idea is actually the transformative aspect of it? I can't think of one. It's hard for me to imagine where, if you've got a truly abstract idea, that that is actually the transformative step. Well, it's the thing that gives the technological advantage. Yeah, because by the nature of abstract, what you're talking about is something that is fundamental. The abstract idea here is the encoding and decoding. Yes. To the extent that there's a technological advantage in that the data is smaller and it's easier to transmit, does that come by virtue of the abstract idea itself? Could that possibly be what is meant by the technological advantage in step two? No. First of all, the abstract idea of encoding and decoding doesn't provide any type of technological transformative step. Again, when you think about encoding and decoding, you're back to the determination of what is abstract or not. Under abstract, of course, as this Court has addressed on a number of occasions, if it's something that's fundamental, something that's prevalent out there, it's abstract. That's telling you that it's conventional. You're saying things that are conventional are abstract? I'm confused by that statement. Well, if you've got something that is fundamental, it's out there, been in place for some number of years and things like that, that's what Alice talks about in other cases. So if you've got something like this, encoding and decoding that has been in place for a century or so, that is an abstract idea. It is not something that gets to the inventiveness. I disagree with your statement that Alice says if something is conventional, then it's abstract. I can understand the District Court's position that the idea of assigning numbers to different images might be abstract, but I'm not sure about saying it's abstract because it's conventional. Well, when you get to the idea, I think... I think this is something Judge Lurie alluded to earlier about some confusion about 102 and 103 versus looking at whether a claim is directed to an abstract idea. There is always that somewhat of a tension, though. Mayo said that when you're really looking at the 101 determination, you obviously import somewhat of a 102-103 analysis because in some way what you're trying to do is understand whether something is conventional or not. And that's why as you step back and you look at the totality of the test under Alice, it really is trying to reach and preclude patents that aren't providing an unconventional technological solution to a technological problem that, again, is transformative. And when you apply that test here, what you find is that the 303 patent doesn't meet that standard. Again, what it is is something that's... Mr. Harris, I think we have your case. Your time has expired. Mr. Baker has some rebuttal time. Thank you, Your Honor. I just finally obviously request the Court affirm the lower court's decision. Thank you very much. Thank you, Your Honors. I would just respond to the last line of questioning by just calling the Court's attention to the fact that in Deere, the Supreme Court appealed a claim that used a mathematical formula and stated that an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection. And they reaffirmed that in Mayo and in Alice, and this Court has reaffirmed that also in Enfish, Bascom, and McRow. And the patent here clearly describes a problem with the existing technological approaches to image coding. It provides a specific technological improvement to that, and that is enough to pass muster under Alice to provide an improvement to an existing technological process. Let me just discuss briefly the identikit issue. As I explained before, even if you accept identikit as prior art and consider it in this case, it did not encode the information in the same way. It did not use code factors. It did not multiply code factors by the image code to generate a single composite image code. It simply concatenated the different elements together. And therefore, this patent, even if you consider identikit, it provides an improvement over that. And, Judge Lawyer, you're right. Really, identikit should be considered, if at all, under Section 102 and 103. A specific technological problem was described. The fact that they can go back and find some manual analog from, you know, 50 years ago, you know, that may raise questions under 102 and 103, but it doesn't mean that this invention was not solving a real problem that existed with a real technological process. Thank you, Your Honors. Thank you, Mr. Baker. We will take the case on revisement. Thank you.